1

2

3

4

5

6

7

8
UNITED STATES DISTRICT COURT

9
FOR THE EASTERN DISTRICT OF CALIFORNIA

10
ANDREW VARGAS,
                                    NO. CIV. S-10-3130 LKK/GGH

11
        Plaintiff,

12
    v.

13
                                    O R D E R
BP AMERICA, INC., JEFF

14
FERIS, JILL GEORGIKAS,
STEVE HONIG, TOM HORN,

15
DEB PORTELLO, WAYNE MALIK,
and DOES 1 through 50,

16
inclusive,

17
        Defendants.

18
_____/

19
    Plaintiff, a former gasoline truck driver for BP America,[1]

20
brings a claim of termination in violation of public policy and

21
_____

22
        [1] By stipulation of the parties, the individual defendants in
this case were dismissed without prejudice on March 4, 2011. The

23
Second Amended Complaint, filed in May, continues to name the
individual defendants, and to refer to them as defendants. During

24
oral argument on September 12, 2011, plaintiff represented to the
court that he does not intend to reassert claims against the

25
individual defendants. Accordingly, any references to the
individual defendants as defendants are stricken from the Second

26
Amended Complaint.

1

breach of his employment contract. Pending before the court is a motion to dismiss the Second Amended Complaint ("SAC"). For the reasons stated below, the motion is DENIED in its entirety.

## I. Background

### A. Factual Background[2]

Plaintiff Andrew Vargas was hired as a gasoline tank truck driver for Atlantic Richfield Co. on or about 1988. SAC 3:14-16. Atlantic Richfield was acquired by British Petroleum America ("BP") in 2000. SAC 3: 17-18. Plaintiff's work was based at a distribution center from which gasoline and petroleum products were distributed to gas stations throughout the Sacramento area.

As a petroleum product supplier, BP was subject to laws and regulations including the Federal Motor Carrier Act, the California Vehicle Code, the California Labor Code, and Cal OSHA. These and other laws and regulations to which BP was subject were intended to protect the general public, users of public roads and highways, gasoline customers, and drivers and employees from safety hazards associated with the storage, transportation, and delivery of petroleum products. The laws and regulations were also intended to protect the environment from these hazards. During the time Plaintiff worked for BP, he received a handbook, letters, and emails from BP relating to safety regulations and procedures. SAC

---

[2] The factual assertions in this section are based on the allegations in Plaintiff's Second Amended Complaint unless otherwise specified. For the purposes of this pleading only, Plaintiff's facts as asserted will be taken as true. <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).

5: 20-27.

At various times during his employment,[3] Plaintiff was instructed to ignore or violate the safety practices established in the handbook, letters, or emails. Specifically, on numerous occasions Plaintiff was instructed to conceal the fact that a gasoline spill in excess of five gallons had occurred and to engage in the practice of dumping gasoline.[4] Defendant frequently coerced and pressured Plaintiff to operate improperly-balanced tanker trucks.[5] Defendant coerced and pressured Plaintiff to deliver loads of gasoline to gas stations where the storage tanks were not in appropriate condition to store additional gasoline. Plaintiff was disciplined for declining to deliver gasoline under such conditions, even though the stated policy of the company was to not deliver gasoline to storage tanks that were not in appropriate condition. Plaintiff was frequently criticized by his employer for refusing to transport "split loads," even though the official company policy was that drivers such as plaintiff had the discretion to not deliver a split load when conditions made it a hazard to do so.[6] Plaintiff was compelled by his employer to override the "skully" device, a safety device intended to prevent

---

[3] The SAC does not provide dates for each of these alleged incidents.

[4] What dumping is, and whether it is prohibited by law or regulation, is not addressed in the complaint.

[5] Once again, what an improperly balanced tanker truck is and whether it is prohibited, is not addressed in the complaint.

[6] Again, the complaint does not address what a split load is.

over-filling of gasoline. Plaintiff was required to take breaks and eat lunch while waiting for his truck to load or unload. Eating near the loading rack is prohibited by Cal OSHA due to risk of exposure to toxic fumes. Plaintiff was instructed to paint over cracked frame rails to conceal the cracks after he reported the cracks during pre-trip inspections of trucks he was driving. Plaintiff was deprived of fifteen-minute rest breaks, creating a higher danger to other drivers on the roads. Plaintiff was threatened with loss of work hours for complaining about a safety hazard caused by a crack in the weld of the rear bulkhead of the truck he was scheduled to drive.

On repeated occasions, Plaintiff complained to Atlantic Richfield and to BP about these hazardous conditions, and about being instructed to violate the company's policies. In addition, in 2000, Plaintiff testified about BP's unfair labor practices before the National Labor Relations Board. SAC 10. On several occasions, Plaintiff anonymously complained about the safety procedure violations via "Open Talk," a website established by BP to report various safety violations. SAC 11:23-27.

On February 5, 2007, Plaintiff received a letter from BP president and chairman Robert A. Malone in response to Plaintiff's anonymous[7] posting on Open Talk. SAC Ex. 1. The letter refers to comments Plaintiff made at some point before October 9, 2006, and

---

[7] It is not clear how Malone delivered the letter to Plaintiff, given the anonymous nature of the Plaintiff's web postings. It is also not clear how Malone knew Plaintiff had made the series of anonymous postings.

requests Plaintiff's assistance in investigating dangerous practices at BP. The letter states, "I can guarantee you that you will not be retaliated against for raising safety concerns. It is against our policy, against my personal principles, and against the law." Plaintiff disclosed his identity to Mr. Malone and participated in the investigation. Plaintiff met with a BP attorney to discuss safety violations, as well as Plaintiff's allegations of retaliation. The attorney and Mr. Malone made representations to plaintiff that the retaliation would cease and that the safety violations would be investigated and corrected.

In response to Plaintiff's internal and external complaints, defendant retaliated against plaintiff by requiring him to perform hard labor even though defendants had knowledge that Plaintiff was on light duty status due to a back injury that occurred in 2006. For example, Plaintiff was required to pick up debris, move equipment weighing 60 to 80 pounds, pull weeds, scrape pigeon excrement off of concrete, and to clean the uncooled warehouse when temperatures were more than 100 degrees, all of which aggravated Plaintiff's back injury and interfered with the efficacy of Plaintiff's medication. Additionally, Plaintiff was instructed not to talk to other employees. The complaint does not allege specific dates for these incidents other than that they occurred after plaintiff injured his back in 2006.

On November 10, 2006, Plaintiff was informed by human resources manager Jill Georgikas that he was being put "out on disability." Plaintiff alleges that starting on November 10, 2006,

5

Defendant engaged in a course of conduct intended to retaliate against Plaintiff and to cause him to quit his job. This course of conduct included contradictory and ambiguous communications regarding Plaintiff's employment status and accommodations; withholding Plaintiff's mail and memos; and withholding plaintiff's medical benefits, short and long term disability payments, and workers' compensation benefits between October or November, 2006 until June 8, 2009 when Plaintiff was terminated.[8]

Relying on Mr. Malone's promise to protect plaintiff from retaliation, Plaintiff complained to BP that he was not receiving responses to his requests for medical benefits. Plaintiff was "cut off" from worker's compensation benefits in March, 2007, and from his medical and dental benefits in May, 2007. Thereafter, plaintiff contacted BP manager Wayne Malik, Jill Georgikas, Dan Place and other BP employees for assistance securing long-term disability medical benefits. Plaintiff received no response. Plaintiff was ultimately denied long-term disability medical benefits on January 24, 2008.[9]

Other allegedly retaliatory conduct by Defendant includes withholding of vacation pay; an order for Plaintiff to stay off BP property; characterizing Plaintiff's employment status as

---

[8] While the court is obliged to give every reasonable inference to the non-moving party, since workers' compensation is not controlled by the defendant, the court cannot give this assertion of retaliation any credence.

[9] Again, this conduct appears to be controlled by the Workers' Compensation agency and attribution to it seems implausible.

1  "suspended without pay," causing Plaintiff to be ineligible to take

2  out an emergency loan from his pension; and failing to provide

3  reasonable accommodations for his back injury, such as retraining

4  for other positions.[10]

5      On March 19, 2009, BP informed Plaintiff that the

6  investigation into Plaintiff's Open Talk safety complaints would be

7  closed. On approximately the same date, BP communicated to

8  plaintiff that it was prepared to offer plaintiff less than $30,000

9  to "close out" Plaintiff's employment.

10      On June 8, 2009, Plaintiff received a notice of termination of

11  his employment.

12  **B. Procedural Background**

13      Plaintiff originally filed this case in state court, and the

14  case was removed to this court on November 19, 2010. On March 4,

15  2011, this court issued an order dismissing the individual named

16  defendants, leaving only BP as defendant.

17      On March 25, 2011, Defendants filed a motion for judgment on

18  the pleadings. On April 27, 2011, the motion was granted, and

19  Plaintiff was granted leave to amend the complaint. Specifically,

20  the court concluded that Plaintiff had provided sufficient notice

21  to defendant as to the public policy basis for his wrongful

22  termination claim, but that Plaintiff had failed to plead facts

23  allowing the court to infer a nexus between plaintiff's complaints

24  about safety violations and Plaintiff's termination. "At a minimum,

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26      [10] Relative to this claim, plaintiff appears not to be making a claim under the Disability Act.

1  in order to adequately plead this [retaliation] theory, plaintiff

2  must at least indicate that the retaliatory conduct began after the

3  alleged protected activity. Without approximate dates attached to

4  the alleged retaliatory incidents, the court is not able to draw an

5  inference that the termination is linked to his protected

6  activity." Plaintiff was granted leave to amend his complaint

7  accordingly. April 27, 2011 Order ("April Order") at 9, ECF No. 20.

8      With respect to plaintiff's breach of contract claim, the

9  court concluded "plaintiff's bare assertion that an implied

10 agreement [to modify the at-will employment presumption] existed is

11 conclusory and insufficient. . . Basic facts such as the names or

12 titles of relevant parties and the type of statements or conduct

13 which is alleged to give rise to the mutual agreement should be set

14 forth in order to give the defendant fair notice of the grounds of

15 the claim, and to make the existence of a mutual agreement

16 plausible." April 27 Order at 10-11.

17     Plaintiff filed a second amended complaint on May 17, 2011.

18 Defendant's motion to dismiss the complaint is now before the

19 court.

20              **II. Standard for a Motion to Dismiss**

21     A Fed. R. Civ. P. 12(b)(6) motion challenges a complaint's

22 compliance with the pleading requirements provided by the Federal

23 Rules.  Under Federal Rule of Civil Procedure 8(a)(2), a pleading

24 must contain a "short and plain statement of the claim showing that

25 the pleader is entitled to relief."  The complaint must give

26 defendant "fair notice of what the claim is and the grounds upon

1  which it rests." Bell Atlantic v. Twombly, 550 U.S. 544, 555

2  (2007) (internal quotation and modification omitted).

3       To meet this requirement, the complaint must be supported by

4  factual allegations. Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S.

5  Ct. 1937, 1950 (2009). "While legal conclusions can provide the

6  framework of a complaint," neither legal conclusions nor conclusory

7  statements are themselves sufficient, and such statements are not

8  entitled to a presumption of truth. Id. at 1949-50. Iqbal and

9  Twombly therefore prescribe a two step process for evaluation of

10 motions to dismiss. The court first identifies the non-conclusory

11 factual allegations, and the court then determines whether these

12 allegations, taken as true and construed in the light most

13 favorable to the plaintiff, "plausibly give rise to an entitlement

14 to relief." Id.; Erickson v. Pardus, 551 U.S. 89 (2007).

15      "Plausibility," as it is used in Twombly and Iqbal, does not

16 refer to the likelihood that a pleader will succeed in proving the

17 allegations. Instead, it refers to whether the non-conclusory

18 factual allegations, when assumed to be true, "allow[] the court to

19 draw the reasonable inference that the defendant is liable for the

20 misconduct alleged." Iqbal, 129 S.Ct. at 1949. "The plausibility

21 standard is not akin to a 'probability requirement,' but it asks

22 for more than a sheer possibility that a defendant has acted

23 unlawfully." Id. (quoting Twombly, 550 U.S. at 557). A complaint

24 may fail to show a right to relief either by lacking a cognizable

25 legal theory or by lacking sufficient facts alleged under a

26 cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901

1 F.2d 696, 699 (9th Cir. 1990).  Finally, of course, the complaint
2 must be comprehensible.

3 ### III. Analysis

4 **A. First Cause of Action: Termination in Violation of Public Policy**

5 Plaintiff alleges that his refusal to participate in, and
6 complaints and reports of illegal and unsafe conduct by BP was a
7 motivating factor for retaliatory conduct by BP, including his
8 termination on June 8, 2009. SAC 24. Defendant argues that the
9 complaint fails to allege a causal connection between any public
10 policy violation and Plaintiff's termination because he fails to
11 allege a specific violation of public policy, and because of the
12 long amount of time that passed between Plaintiff's alleged
13 complaints and his subsequent termination.

14 In California, a claim of wrongful termination in
15 contravention of public policy requires some basis in policy that
16 is delineated in a constitutional or statutory provision. Gantt v.
17 Sentry Ins., 824 P.2d 680, 684 (Cal. 1992). The public policy may
18 also be enunciated in an administrative regulation. Green v. Ralee
19 Eng'g Co., 960 P.2d 1046, 1051 (Cal. 1998). The policy violated
20 must be fundamental and affect a public interest rather than only
21 personal or proprietary interests. Id.; Gantt, 824 P.2d at 684. The
22 language of the law or constitutional provision need not prohibit
23 the exact conduct alleged, but must express a "clearly mandated
24 public policy" that is contravened by the alleged conduct. Id. at
25 1061. "[T]he policy must be public in that it affects society at
26 large rather than the individual, must have been articulated at the

10

1  time of discharge, and must be fundamental and substantial." Id. at

2  1051 (internal quotations omitted); See also Carter v. Escondido

3  Union High School District, 56 Cal. Rptr. 3d 262, 266 (Cal. Ct.

4  App. 2007). Mere violation of an employer's own policies, is not

5  protected by the public policy doctrine. "The tort of wrongful

6  discharge is not a vehicle for enforcement of an employer's

7  internal policies or the provisions of its agreements with others."

8  Turner v. Anheuser-Busch, Inc., 876 P.2d 1022, 1033 (Cal. 1994).[11]

9  **i. The Public Policy**

10  With respect to defendant's first argument––that Plaintiff

11  fails to allege a specific violation of public policy––this court

12  already held in this case that Plaintiff need not plead the

13  specific statute or regulation that was thwarted by his

14  termination. "By alleging that defendant 'was subject to numerous

15  and various laws . . . intended to protect the general public from

16  safety hazards inherent in the storage, transport, delivery,

17  pumping, disposal, and other handling of large quantities of highly

18  toxic, flammable and volatile gasoline fumes,' and 'were intended

19  to protect the environment from damage,' and 'were promulgated

20  and/or enforced by various governmental agencies including but not

21  limited to the United States Congress, Environmental Protection

22  Agency, [and] the State of California . . .' plaintiff has provided

23  sufficient notice to defendant as to the public policy basis for

24

25  [11] Of course if the employer's policy reflects a public policy

26  as defined above, the employer's policy may be relevant to demonstrate intentional conduct for purposes of measuring damages.

1  his wrongful termination claim." April Order 7:14-24. Nonetheless,

2  Defendant argues that Plaintiff fails to state a claim because he

3  "does not allege any specific article or section of any statute to

4  support his claim." Def.'s Mot. 8.

5       Defendant's continued reference to Turner v. Anheuser-Busch,

6  Inc., 7 Cal. 4th 1238 (Cal. 1994) is inapposite. There, the

7  California Supreme Court held that the Plaintiff could not survive

8  summary judgment because he did not state the specific statutory

9  provisions delineating a public policy. Plaintiff's "vague charge

10  of 'Alcohol, Tobacco, and Firearms laws' violations," the Court

11  held, was "plainly insufficient to create an issue of material fact

12  justifying a trial." Id. at 1257. The Court's holding on this

13  substantive point of law does not alter the federal pleading

14  requirements, which apply in this case. See, e.g. Tribble v.

15  Raytheon Co., 2011 U.S. App. Lexis 2895 (9th Cir. 2011).

16  Accordingly, the court concludes once again that notice pleading

17  does not require Plaintiff to state in his complaint the statutory

18  or regulatory basis of the claimed violation of public policy in

19  order to survive a 12(b)(6) motion to dismiss.[12]

20  **ii. Nexus**

21       In order to state a claim for termination in violation of

22  public policy, Plaintiff must assert facts allowing the court to

23  plausibly infer that there was a nexus between the public policy

24  and the termination. In the April Order, this court held that

25

26       [12] Of course, in response to discovery, plaintiff will have to
   spell out the statutes and regulations he relies on.

1  plaintiff, by failing to "allege the approximate dates for any of
2  the incidents alleged to constitute a [retaliatory] course of
3  conduct," had not adequately demonstrated that a retaliation theory
4  was plausible. April Order 9. "At a minimum, in order to adequately
5  plead this theory, plaintiff must indicate that the retaliatory
6  conduct began after the alleged protected activity. Without
7  approximate dates attached to the alleged retaliatory incidents,
8  the court is not able to draw an inference that the termination is
9  linked to [plaintiff's] protected activity." Id. The court
10 dismissed the first cause of action on that basis, and granted
11 Plaintiff leave to amend the complaint accordingly.

12     In his SAC, Plaintiff alleges that he made complaints about
13 various health and safety violations "from time to time," and "at
14 one point." For example, the SAC states that "on one occasion . .
15 . [plaintiff] stated [to his supervisor] that peening the crack [in
16 a weld on the tanker truck] would not solve the safety hazard." The
17 supervisor then "threatened him with the loss of work hours if he
18 did not do as he was told." SAC 9.[13] The court cannot infer anything
19 about the date of this occurrence, other than that it occurred some
20 time between 1998, when Plaintiff began his employment with BP's
21 predecessor, and approximately November 10, 2006, when Plaintiff
22 went out on disability. SAC 13.

23

24     [13] Even if plaintiff does not recall the dates of the
   incidents he alleges, he must be able to say that they occurred
25 prior to the retaliation or that they occurred subsequent to the
   initiation of retaliation, but were a cause to continue or
26 intensify retaliation.

1    However, the court can infer that Plaintiff was subjected to
2  a retaliatory course of conduct following disclosure of his
3  identity to BP CEO Robert Malone, culminating in termination. At
4  some point shortly before October 9, 2006, Plaintiff anonymously
5  submitted some concerns to Open Talk. BP CEO and president Robert
6  Malone responded via Open Talk on October 9, 2006. Mr. Malone sent
7  a letter to Plaintiff on February 7, 2007. Ex. 1 to SAC.[14] At some
8  point thereafter, Plaintiff disclosed his identity to Mr. Malone.
9  Plaintiff then began meeting with BP's attorney in a series of
10 briefing meetings throughout 2007, after agreeing to be identified
11 with his anonymous safety complaints and cooperating with an
12 investigation. SAC 12: 9-13. Plaintiff had a final briefing meeting
13 with BP in March 2009, three months before Plaintiff was terminated
14 in June 2009. SAC 20: 1-15.

15   One month after Plaintiff received the letter from PB's
16 president and agreed to come forward with his safety concerns, BP
17 notified him that his worker's comp benefits had been "cut off."
18 SAC 15: 11-22. Prior to this notification in March 2007, Plaintiff

19
20

_____

21    [14] It is unclear to the court how this letter got to plaintiff
   before plaintiff revealed his identity to Mr. Malone. The SAC
22 states that the letter was "sent" to him, but plaintiff only
   alleges that he revealed his identity after receiving the letter.
23 Based on the allegations in the complaint, the court can only infer
   that plaintiff's identity became known to Malone at some point
24 after February, 2009. Similarly, because plaintiff has not attached
   dates to any of his prior safety complaints made directly to
25 supervisors, the court cannot infer any retaliatory conduct based
   on those complaints. Therefore, the court only addresses alleged
26 retaliatory conduct that occurred after February 2009.

1  was not able to get a response about the status of those benefits.[15]

2      Three months after Plaintiff received the letter from BP's

3  president, BP informed Plaintiff in May 2007 that his medical and

4  dental benefits had been discontinued. SAC 15: 11-22.

5      For several months after plaintiff received a letter from BP's

6  president, Plaintiff stopped getting any company mail which would

7  have notified him of his long-term disability benefits status. Five

8  months after receiving the BP president's letter and agreeing to

9  come forward, Plaintiff physically visited his mailbox at the

10 Sacramento Terminal in July 2007 and was told to leave because a

11 guard had called the police.

12     During the eight month period after Plaintiff received the

13 letter from BP's president, he was not able to get information he

14 needed about his long-term disability benefits. This changed when

15 Plaintiff met with BP's attorney Joan Fife and BP's Human Resources

16 employee Stacey Turner in October 2007. In this meeting, Turner

17 told Plaintiff he had one week to file for the benefits or he would

18 be time-barred from applying. SAC 16: 11-48. Those benefits were

19 denied eleven months after Plaintiff received the letter from BP's

20 president and agreed to come forward with his safety complaints.

21 The reason BP's provider denied Plaintiff his long-term disability

22 benefits was because BP's provider could not establish his identity

23 and "why he was taken out of work" on Nov. 13, 2006. SAC 16: 18-28.

24

25          [15] Repeating, it is not clear to the court how conduct by an
   independent governmental agency can be construed as employer
26 retaliation.

1    Plaintiff appealed this denial and tried to get the status of
2  his employment by calling Jill Georgikas, Dan Place and other BP
3  employees. Id. He was not successful in getting the information,
4  and was again denied benefits by BP's provider this time, due to
5  lack of medical documentation. SAC 17: 1-13.[16]

6    Thirteen months after receiving the letter from BP's
7  president, Plaintiff applied for an emergency loan from his BP
8  pension in order to prevent his home from going into foreclosure in
9  March 2008. SAC 18: 12-16. However, he was told by his pension fund
10 manager at Fidelity that he could not receive a loan because his
11 employment status was "suspended without pay." SAC 17:1-13.

12    The court notes that these incidents are relevant only as
13 evidence of defendant's retaliatory motive for terminating
14 plaintiff. The claim for which plaintiff seeks to recover is
15 wrongful termination, not wrongful denial of any benefits or
16 withholding of information. Plaintiff neither seeks nor pleads
17 facts adequate to support recovery for any allegedly retaliatory
18 conduct other than his termination.

19    From these allegations, the court can plausibly infer that BP
20 engaged in a retaliatory course of conduct against Plaintiff,
21 culminating in termination of plaintiff in June 2009. It may be
22 that some of the incidents that plaintiff is asserting after he
23 came forward with his identity upon receiving Mr. Malone's letter
24 in February 2007, show that BP retaliated against Plaintiff by in

25

26    [16] Again, it is not clear how the result is attributable to
   defendant.

16

some way interfering with Plaintiff's workers' compensation benefits, medical and dental benefits, and long-term disability benefits

Defendant asserts that the 31-month gap between November 10, 2006, when Plaintiff went out on disability, and June 8, 2009, when Plaintiff was terminated from his employment, renders any inference of nexus implausible. Defendant describes two alternative theories involving a 28-month, and 23-month gap respectively. Defendant argues that these theories do not plausibly give rise to an inference of nexus between any protected activity by Plaintiff and Plaintiff's termination. However, during what the defendant describes as a "gap" in time between Plaintiff's safety complaints and his ultimate termination, Defendant was allegedly engaged in a series of escalating tactics intended to make Plaintiff voluntarily quit his job, such as withholding information necessary for plaintiff to get disability benefits. Plaintiff's theory apparently is that when he did not quit, he was terminated. By attaching dates to his health and safety complaints via Open Talk and to Mr. Malone, as well as the dates of "retaliatory" conduct that followed, Plaintiff has adequately pled a nexus between his alleged protected activity and the asserted retaliatory termination.

**iii. Preemption**

Defendant argues that Plaintiff's claims, insofar as they are premised on denial of workers' compensation, medical, and dental benefits are preempted by ERISA and by the California Workers' Compensation Act. Plaintiff's wrongful termination claim, however,

1  is not premised on the denial of those benefits. Allegations about

2  interference with those benefits serve to explain the lag in time

3  between Plaintiff's health and safety complaints and his ultimate

4  termination, and to demonstrate a pattern of retaliatory conduct.

5  Plaintiff does not seek remedies intended to compensate him for the

6  loss of those benefits.

7      Accordingly, defendant's motion to dismiss the first cause of

8  action is DENIED.

9  **B. Second Cause of Action: Breach of Employment Contract**

10     As his second cause of action, Plaintiff alleges that he was

11 employed pursuant to an "oral and/or implied agreement that

12 Defendants [sic] would continue Plaintiff's employment for an

13 indefinite period of time into the future so long as Plaintiff

14 fulfilled his duties and obligations under the employment

15 agreement, and that Plaintiff's employment would not be terminated,

16 except for good cause." SAC 26: 10-16. Plaintiff alleges that he

17 was terminated without cause on June 8, 2009, in violation of this

18 employment contract. Defendant argues that even if there as a for-

19 cause employment contract, plaintiff's termination does not

20 constitute a breach of contract since, according to defendants,

21 plaintiff's "100% permanent disability" constitutes good cause for

22 termination. Def.'s Mot. to Dismiss 23, ECF No. 22-1.

23 **i. "Good cause" employment contract**

24     In California, employment is presumed to be at-will.

25 California Labor Code § 2922. The presumption of at-will contract

26 may be overcome by express contract, or where the parties' conduct

1 demonstrates an implied promise not to terminate without good
2 cause. Guz v. Bechtel National, 9 P.3d 1089, 1100 (Cal. 2000).
3 Courts look to the totality of the circumstances to determine if an
4 employment agreement exists, including the "personnel policies or
5 practices of the employer, the employee's longevity of service,
6 actions or communications by the employer reflecting assurances of
7 continued employment, and the practices of the industry in which
8 the employee is engaged. Foley v. Interactive Data Corp., 765 P.2d
9 373, 387 (Cal. 1988) (quoting Pugh v. See's Candies, 116 Cal.
10 App.3d 311, 327 (1981). "Whether the employee has shown that the
11 totality of the circumstances establish an implied employment
12 contract sufficient to overcome the presumption of at-will
13 employment generally is a question of fact to be determined by a
14 jury." 3 Witkin Summary of California Law § 233 (10th ed.
15 2005)(citing Foley, 765 P.2d 381).

16      Further, at-will provisions in personnel handbooks or manuals
17 do not necessarily overcome other evidence of the employer's
18 contrary intent, "particularly where other provisions in the
19 employer's personnel documents themselves suggest limits on the
20 employer's termination rights." Guz, 9 P.3d 1089, 1103 (Cal. 2000).

21      In this case, Plaintiff alleges that sections of the BP Code
22 of Conduct Policy Manual, the BP Business Policies Manual, BP's
23 Workplace Performance Development Program, and observations of his
24 supervisors engaging in progressive discipline with coworkers
25 constitute an implied contract not to terminate Plaintiff without
26 cause.

1    Plaintiff alleges that BP Group Chief Executive John Browne

2 stated that the BP Code of Conduct "sets out standards for each

3 individual. Failure to observe the code is a cause for disciplinary

4 action which could involve dismissal. All employees must follow

5 this code. Failure to do so is taken very seriously and may result

6 in disciplinary action up to and including dismissal." SAC 26-27.

7 According to Plaintiff, the Business Policies Manual explains,

8 among other things, "Our policy expectations with regard to

9 individuals is that we will act fairly and justly." SAC 27. The

10 Workplace Performance Development Program states:

11       when people do their jobs well, they've earned the
         right to be recognized for their work. When they don't,
12       they deserve the right to be told about it and given
         the chance to correct the problem. . . BP believes that
13       most of the time, when problems arise, they can be
         solved simply by bringing the situation to the
14       individual['s] attention, discussing the issues and
         seeing an agreement to change and improve
15       performance...There are three formal levels in the
         Workplace Performance Development Program: 1. Verbal
16       reminder. 2. Written warning. 3. Decision-making leave.

17 SAC 28.

18    These manuals were given to Plaintiff during his employment,

19 and he "was told that they represented the company's and its

20 management's promises to him." SAC 28-29. Plaintiff also states

21 that he saw managers Jill Georgikas and Jeff Ferris use this

22 progressive discipline approach with other employees. SAC 29: 3-8.

23    Defendant counters that the policies and code of conduct

24 "expressly reserves [to BP] the option to summarily terminate its

25 employees or engage in progressive discipline." Def.'s Mot. 21.

26 Defendant quotes from the same Workplace Performance Development

1  Plan that "[d]ecisions are handled on a case-by-case basis." Def.'s

2  Mot. 22. Additionally, the plan states that the progressive

3  disciplinary steps can be bypassed. Id. Defendant argues that BP

4  did not restrict its right to terminate employees without notice

5  and without cause.

6      Defendant argues that plaintiff selectively cited sections of

7  the employment manuals, see, e.g., Mot. 22.  But that is of no

8  import at this stage. Defendant alleges that the manuals also

9  provide that "disciplinary or termination decisions are handled on

10 a case-by-case basis," and that the progressive discipline steps

11 "may be bypassed." Id. Defendant's allegations are, however,

12 unavailing. "When ruling on a motion to dismiss, we may generally

13 consider only allegations contained in the pleadings, exhibits

14 attached to the complaint, and matters properly subject to judicial

15 notice." Colony Cove Properties, LLC v. City Of Carson, 640 F.3d

16 948, 955 (9th Cir. 2011). It is true, as defendant asserts, that

17 the court "need not accept as true conclusory allegations that are

18 contradicted by documents referred to in the complaint," id., but

19 the policy manuals quoted in Plaintiff's complaint are not before

20 the court and the allegations in Defendant's motion are not

21 entitled to any presumption of truth.

22     By alleging that policy manuals distributed by Defendant

23 established a progressive discipline system, promised "fair and

24 just" treatment, and promised employees an opportunity to improve

25 performance before termination, Plaintiff has alleged sufficient

26 facts from which a jury might infer an agreement not to terminate

1 without good cause.  Of course, on a motion for summary judgment,

2 the defendant can tender the manual. [17]

3 **ii. Whether plaintiff's termination was for good cause**

4       Defendant argues that even if it had an obligation to only

5 terminate plaintiff for cause, plaintiff's complaint fails to state

6 a claim because the complaint concedes that plaintiff was unable to

7 perform his job due to a disability, constituting good cause for

8 the termination. See Def.'s Mot. to Dismiss 23, ECF No. 22. The

9 paragraph of the complaint cited by defendant doesn't exactly make

10 such a concession.  The paragraph states that plaintiff was

11 "frustrated by British Petroleum's continuing refusal and/or

12 inability to confirm Plaintiff's true employment status. . .

13 regarding (1) the date Plaintiff was medically determined by a

14 qualified medical doctor to be 100% permanently disabled form

15 working. . . as a truck driver." SAC ¶ 51. The court can reasonably

16 infer that plaintiff, rather than admitting that he was permanently

17 disabled, was describing his process of seeking information from

18

19        [17] The court notes that Plaintiff has also adequately pled an
express written agreement that defendant would not retaliate
20 against plaintiff for his health and safety complaints, separate
from any agreement that may provide for termination only with
21 cause. In the February 5, 2007 letter, Mr. Malone stated "I can
guarantee you that you will not be retaliated against for raising
22 safety concerns. It is against our policy, against my personal
principles, and against the law. I will offer you these assurances
23 with no strings attached." Ex. A to SAC. Regardless of whether or
not defendant agreed not to terminate Plaintiff without good cause,
24 it appears that defendant agreed not to terminate plaintiff in
retaliation for his complaints. In other words, even if defendant
25 preserved the right to fire Plaintiff for some arbitrary reason,
defendant may have promised not to fire plaintiff for a retaliatory
26 reason.

1   defendant about defendant's determination that plaintiff was
2   permanently disabled. This reading is consistent with plaintiff's
3   asserted theory that he was terminated in retaliation for his
4   health and safety complaints, but that defendant engaged in a
5   course of conduct to "terminate plaintiff in a way that would
6   appear to be consistent with the law and their personnel policies.
7   . . . to prevent him from any legal recourse." SAC ¶ 52.

8       Defendant's motion to dismiss the claim for breach of contract
9   is DENIED.

10  **C. Third Cause of Action: Breach of Implied Covenant of Good Faith**
11  **and Fair Dealing**

12      Plaintiff's third cause of action is for breach of the
13  covenant of good faith and fair dealing. SAC 30. Plaintiff alleges
14  he was terminated for pretextual reasons after he testified for the
15  Labor Board, complained of BP's health and safety hazards, and
16  refused to ratify BP's regulatory violations. SAC 30: 25-28, 31: 1-
17  5. Plaintiff argues that BP was required to perform the terms and
18  conditions of the employment agreement fairly and in good faith,
19  and refrain from doing any act that would impede Plaintiff from
20  performing on the conditions of the contract. SAC 30: 7-15.
21  Defendant counters there was no underlying employment agreement
22  that prevented BP from terminating plaintiff without cause. Def.'s
23  Mot. 24: 7-28.

24      Every contract imposes a duty of good faith and fair dealing
25  on its parties, but a claim for breach of the implied covenants is
26  distinguishable from a breach of contract claim in that the implied

covenants provide a "safety valve to which judge may turn to fill gaps and qualify or limit rights and duties otherwise arising under rules of law and specific contract language." <u>Foley</u>, 765 P.2d at 389 (internal quotations omitted). The implied covenants prevent a party from acting in bad faith to frustrate the purpose of the mutual agreement. <u>Guz</u> 8 P.3d at 1112 n. 18. A breach of the implied covenants may not, however, enforce obligations beyond the terms of the agreement. <u>Id.</u> at 1112.

Here plaintiff has pled a claim for breach of contract, and therefore may make out a claim for violation of the implied covenants on the facts alleged. Plaintiff alleges that he relied on company policies aiming "for a radical new openness" where workers "have open and constructive conversations about the[ir] performance and to be fairly treated." SAC 27: 9-13. Plaintiff also alleges that he relied upon the individualized promises made by BP President Robert Malone in his February 2007 letter requesting Plaintiff's help. SAC 12: 24-28, 13: 3-17, Ex. 1.

Plaintiff alleges he relied on representations made in employment manuals and by Mr. Malone that he would not be punished for communicating openly about health and safety concerns, but that he was terminated for doing just that. Such conduct by Defendant, according to Plaintiff, constitutes bad faith. The determination of whether the employer engaged in bad faith is a question of fact. 3 Witkin <u>Summary of California Law</u> § 239 (10th ed. 2005).

On similar allegations, California courts have found a triable issue as to whether there was a breach of the implied covenant. For

1  example, in <u>Kelecheva v. Multivision Cable T.V. Corp.</u>, 18
2  Cal.App.4th 521 (1993), the court found that allegations that an
3  employer failed to follow its own personnel policies relating to
4  safety and progressive discipline provide a basis for a claim of
5  breach of the implied covenant of good faith and fair dealing.

6      Accordingly, Defendant's motion to dismiss the third cause of
7  action is DENIED.

8                      **IV. Conclusion**

9      For all the above reasons, defendant's motion to dismiss, ECF
10  No. 22 is DENIED in its entirety.

11      IT IS SO ORDERED.

12      DATED:  September 20, 2011.

15                  LAWRENCE K. KARLTON
16                  SENIOR JUDGE
                    UNITED STATES DISTRICT COURT

                              25